**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT JONES,<br>*Plaintiff*,<br><br>v.<br><br>C/O B. COOK, *et al.*,<br>*Defendants*. | :<br>:<br>:<br>:<br>:<br>:<br>: | <br><br><br>CIVIL ACTION NO. 26-CV-1491 |

**MEMORANDUM**

**Pappert, J.** **September 14, 2026**

*Pro se* Plaintiff Robert Jones, a pretrial detainee currently held at the Philadelphia Industrial Correctional Center, brings this civil action pursuant to 42 U.S.C. § 1983 based on several incidents that allegedly occurred at PICC over the course of several months.[1] He also seeks leave to proceed *in forma pauperis*. For the following reasons, the Court will grant Jones leave to proceed *in forma pauperis* and dismiss his Complaint in part with prejudice and in part without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), while permitting certain claims to proceed. Jones may file an amended complaint or proceed on the claims that pass statutory screening.

---

[1] Jones names as Defendants: (1) Correctional Officer Bryant Cook; (2) CO Morrison; (3) CO Green; (4) Lt. McMichael; (5) Disciplinary Hearing Officer Jane Doe; (6) John Doe, a YesCare medical provider; (7) Jane Doe 2, a YesCare medical provider; (8) Jane Doe 3, a YesCare medical provider; (9) Sergeant Bynum; (10) Sergeant Davis; (11) CO Lee; (12) CO J. Williams; (13) CO Pugh; (14) CO Hall; (15) CO Mink; (16) Lt. Singh; (17) Lt. K. Sampson; (18) Lt. Sam; (19) Deputy Warden Booker; and (20) Warden Patterson. (Compl. at 1-5.)

# I[2]

Jones alleges claims based on several seemingly-unrelated alleged incidents at PICC, spanning roughly from September 2024 to June 2025.

## A

Jones asserts that on September 12, 2024, during recreation time on the H2 Unit, four inmates — whom he refers to as I.P.1, I.P.2, I.P.3, and I.P.4 — got into a verbal and then physical altercation. (Compl. at 6 ¶¶ 1-7.) Officer Cook was the sole officer in charge of the unit. (*Id.* ¶ 3.) Initially, Cook did not intervene, but eventually ordered other inmates to stop the fighting. (*Id.* ¶¶ 8-9.) Cook then put I.P.1 and I.P.2 back in their cell but allowed I.P.3 and I.P.4 to remain out of their cells, even though it was not recreation time for their tier. (*Id.* at 7 ¶ 10.) I.P.3 and I.P.4 then turned their aggression toward Jones, who was from the same neighborhood as I.P.2, with whom they had just been fighting. (*Id.* ¶ 11.) I.P.4 "began to threaten [Jones] and circled him a number of times in a[n] attempt to blindside [him]." (*Id.*) Cook "stood by his desk and watch[ed] [the] ongoing dispute between [Jones] and I.P.3 and I.P.4." (*Id.* ¶ 12.) While Jones stood at a water fountain near Cook's desk, I.P.4 attacked him, badly cutting his lip. (*Id.* ¶ 14.) Jones' "mouth began to bleed badly, and half of [his] lip was hanging off[.]" (*Id.* ¶ 15.) As Jones reeled from the attack, another inmate came to his aid, and I.P.3 and I.P.4 both "took a stance as if they were prepare[d] for combat as they

[2] The facts set forth in this Memorandum are taken from Jones's Complaint (Dkt. No. 2), which consists of the Court's form complaint for use by *pro se* litigants, along with several handwritten and typewritten pages, and 36 pages of exhibits. Some of the exhibits are copies of handwritten prison grievances that are entirely illegible due to the faintness of the print. The Court adopts the pagination assigned to the Complaint by the CM/ECF docketing system. Where the Court quotes from *pro se* submissions, punctuation, spelling, and capitalization errors will be cleaned up as needed.

both clutched weapons." (*Id.* ¶ 17.) Jones and his cellmate eventually managed to disarm I.P.4., who was holding a makeshift knife. (*Id.* ¶¶ 19-20.) Throughout the altercation with I.P.3 and I.P.4, Officer Cook took no action to stop the incident. (*Id.* at 7 ¶ 18.) Finally, about two minutes later, another officer arrived and sprayed several of the involved parties with pepper spray, ending the incident. (*Id.* at 8 ¶ 23.) Jones asserts that the "bubbles officer,"[3] rather than Officer Cook, called for the officer to respond to the incident. (*Id.* ¶ 24.)

Jones was transported to an area hospital after the incident where he was treated for "severe damage to [his] right upper lip." (*Id.* at 8 ¶ 28.) He "now has a permanent scar that distorts his features." (*Id.* ¶ 30.) Upon returning to P.I.C.C., Jones received a misconduct report filed against him by Officer Cook and provided to him by Sgt. Bynum, in which he described the attack by I.P.4 as "a physical altercation" between the two inmates and stating that he gave the two inmates "several verbal orders" to cease fighting, "at which time they ceased their actions." (*Id.* at 8 ¶ 31 to 9 ¶ 32.) Jones disputed the account and told multiple officers that the charges were false, including at a September 19, 2025 informal disciplinary hearing, where Officer Jane Doe served as the hearing officer. (*Id.* at 9 ¶¶ 33, 36.) Jones gave Officer Doe his account of the events, asked her to review the surveillance footage from the incident, and requested appeal and sanction forms; Doe said she would review the footage and send forms to his cell, but Jones never received the forms and alleges Doe did not review the footage. (*Id.* at 10 ¶¶ 41, 43; *id.* at 35.) Jones later learned he was found

[3] Jones is presumably referring to a remote security officer monitoring the unit from a control room, or "bubble."

guilty of the misconduct charge and fined $200, which was debited from his account. (*Id.* ¶ 44.) Jones appealed the misconduct but received no response to his appeal. (*Id.* ¶ 46.) Jones also filed a grievance and then an appeal regarding Officer Cook's inactions during the September 12 incident. (*Id.* ¶ 47.) It is unclear from the Complaint what resulted from that grievance and appeal.

Based on the September 12, 2024 incident, Jones asserts a Fourteenth Amendment failure to protect claim[4] against Defendant Cook and potentially other Defendants;[5] a supervisory liability claim against Defendant McMichaels based on his failure to discipline Officer Cook or take other corrective action following the September 12 incident; and Fourteenth Amendment due process claims against Officer Jane Doe, Warden Patterson, and potentially other supervisors based on their failure to review the surveillance footage or provide him with the requested appeal and sanction forms. (*Id.* at 33, 35.)

---

[4] Jones asserts several claims under the Eighth Amendment. However, because he was a pretrial detainee during the relevant events, the Fourteenth Amendment Due Process Clause governs his claims. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400-01 (2015) (explaining that excessive force claims brought by pretrial detainees are analyzed under the Fourteenth Amendment's Due Process Clause); *see also Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005) (stating that conditions of confinement claims brought by pretrial detainees are governed by the Fourteenth Amendment's Due Process Clause). In liberally construing a *pro se* pleading, the Court will "apply the relevant legal principle even when the complaint has failed to name it." *Vogt,* 8 F.4th at 185 (quoting *Mala*, 704 F.3d at 245). Federal courts sometimes will thus ignore the legal label that a *pro se* litigant attaches to their pleadings. *Castro v. United States*, 540 U.S. 375, 381-82 (2003).

[5] In the Amended Complaint's legal claims section, Jones frequently refers within a single sentence, confusingly, to numerous Defendants and multiple claims arising from several different incidents. (*See* Am. Compl. at 33-38.) Jones also sometimes asserts in his factual allegations section the involvement of Defendants who are not mentioned in the legal claims section for the same incident. The Court is thus unable to discern which Defendant(s) he purportedly sues for each incident.

B

On November 10, 2024, Jones was housed on G2 Unit at PICC, where Officer Morrison was the sole officer assigned to the unit. (*Id*. at 11 ¶¶ 1-3.) Morrison was handing out cookies to inmates but skipped Jones' cell. (*Id*. ¶ 5.) When Jones protested, Morrison responded, "don't ask me nothing I know why you're in jail," which sent the other inmates "in an uproar." (*Id*. ¶ 8.) Other inmates then surrounded Jones's cell and asked what he was in for, to which Morrison responded, "because he is a rapist." (*Id*. ¶ 9.) Morrison added that Jones "better check in ([request] protective custody), or he was gonna get treated (beat up) this is G2 we don't tolerate no creeps." (*Id*.) Morrison then pulled up Jones's records on his computer and allowed any inmate who wanted to view the records. (*Id*. ¶ 10.) The inmates "again went into an uproar and ran from door to door spreading what they just was shown by Officer Morrison, and [came] back around plaintiff['s] door, laughing and joking about the matter." (*Id*. at 12 ¶ 11.) Morrison then "approached [Jones's] door telling him he better check in or he's gonna die at 1pm-4pm recreation period for bottom tier[.]" (*Id*. ¶ 12.) At recreation time, Morrison came to release Jones from his cell, accompanied by more than nine other inmates. (*Id*. ¶ 15.) Morrison stated that Jones "will die, all he has to do is green light it[.]" (*Id*.) Jones eventually realized that the inmates were "bluffing and only did what was asked to gain favor with" Morrison. (*Id*. ¶ 17.) None of the inmates attacked Jones during recreation. (*Id*.) However, Morrison's actions "made it hard for [Jones] to use the phone, tablet, and [he] had further issues with [inmates] housed in [his] cell" due to Morrison's disclosures. (*Id*. ¶ 18.) Jones was also "treated deliberately different

by female officers who denied him law library, and left him in his cell during recreation periods." (*Id.* ¶ 19.)

Jones tried submitting a grievance regarding the incident to Lt. McMichael and Sergeant Davis, but Davis returned it to Jones "while laughing and stated that [Morrison is] not on our squad" and directed him to file the grievance with Lt. Singh, Morrison's supervising officer. (*Id.* ¶ 20; *id.* at 13 ¶ 21.) Jones placed his grievance in the "unit box and received no response." (*Id.* at 13 ¶ 22.) Jones later asked Officer Green why he received no response to his grievance and she told Jones to "leave her alone." (*Id.* ¶¶ 23-24.) Jones filed an appeal of his grievance but received no response. (*Id.* ¶¶ 25-26.)

Based on these allegations, Jones asserts a Fourteenth Amendment failure to protect claim against Defendant Morrison, and Fourteenth Amendment due process claims against Defendants McMichael, Davis, Green, and potentially others.

C

On the evening of December 11, 2024, while being housed on G2 Unit, Jones requested a tablet from Officer Lee, who was the sole officer assigned to the unit at the time. (*Id.* at 14 ¶¶ 1-3.) After Lee gave Jones the tablet, another inmate "came up behind [him] and snatched [the] tablet, and took off running around the dayroom." (*Id.* ¶ 4.) Jones and the inmate got into a physical struggle for the tablet, and several other inmates "began to crowd around and involved themselves in the matter," but Officer Lee did not intervene. (*Id.* at 15 ¶¶ 8-9.) During the altercation, "some [inmates] were stabbing [Jones] while pretending to break up" the fight; one inmate shoved Jones, injuring his back; another stabbed Jones in the head. (*Id.* ¶¶ 10-11.) At no point did

Officer Lee attempt to intervene or call for help. (*Id.* ¶ 14.) Eventually, Lee attempted to grab Plaintiff; after initially escaping her grasp, Jones allowed himself to be handcuffed and escorted off of the unit to an area outside Lt. Singh's office. (*Id.* ¶¶ 15-17.) Lt. Singh then left to review the footage of the incident. (*Id.* at 16 ¶ 18.)

Singh escorted Jones to the medical unit, where he was examined by two nurses, who counted seven stab wounds on his body. (*Id.* ¶ 20.) Defendant John Doe, an unspecified medical provider, examined Jones. (*Id.* ¶ 22.) Jones advised Doe of his back injury, that his right bicep was inflamed from a stab wound, and that he was worried about the depth of the stab wound to his head. (*Id.*) He asked to be tested for transmissible diseases, for a tetanus shot, and to be taken to an outside hospital for evaluation and treatment. (*Id.* ¶¶ 22-23.) However, John Doe told Lt. Singh that Jones didn't require a hospital visit and cleared Jones to return to his cell; he was escorted to a Restricted Housing Unit cell with no further medical treatment. (*Id.* ¶¶ 24-25.) Jones's right bicep remained inflamed and he could not use it for "a few days"; his back "was bruised purple from his fall" and "it was difficult for [Jones] to stand up straight for a week." (*Id.* ¶ 26.) The wound on his head continued to bleed for two days. (*Id.*) Jones submitted several sick call slips but received no wound care or pain medication and was not tested for tetanus or other diseases. (*Id.* ¶ 27.) His back injury has still not fully healed. (*Id.*)

Despite not initially being charged with misconduct, on December 16, 2024, Jones was charged for fighting, assault, "disturbing other inmates and staff," "refusal to comply [with] all orders," and possession of a weapon. (*Id.* at 16 ¶ 28; *id.* at 17 ¶¶ 29-30.) Officer Jane Doe conducted the informal disciplinary hearing. (*Id.* at 17 ¶¶ 30-31.)

Jones presented his account of the incident and asked Jane Doe to review the surveillance footage but she failed to do so. (*Id*. 17 ¶ 32 to 18 ¶ 36; *id*. at 35.) She ultimately found him guilty of the misconduct, imposing "60 days punitive" and a $200 medical fee without providing written reasons for the finding. (*Id*. at 18 ¶¶ 38-40.) Jones appealed the guilty finding but Warden Patterson affirmed Doe's decision "even after review of footage that contradicts misconduct." (*Id*. ¶¶ 41-43.) Jones also filed a grievance regarding the disciplinary hearing but received no response. (*Id*. ¶ 46.)

Based on the above allegations, Jones asserts a Fourteenth Amendment failure to protect claim against Defendant Lee, Fourteenth Amendment denial of adequate medical care claims against Defendant John Doe, and Fourteenth Amendment procedural due process claims against Defendant Jane Doe and Warden Patterson.

D

Jones alleges that on or about December 25, 2024, the heat stopped working in the Restricted Housing Unit, subjecting him to "freezing cold temperatures for weeks." (*Id*. at 19 ¶ 47.) He alleges that he could see his own breath and "shivered constantly until his muscles ached from exhaustion," (*id*. ¶ 48), and that correctional officers were wearing winter coats, hats and gloves on the block, (*id*. ¶ 53.) The cold caused severe pain to his left leg, a result of an old gunshot wound to his left knee cap, "which made it difficult for [Jones] to walk, or stand long[.]" (*Id*. ¶ 49.) Jones "spent his days under the covers to keep warm," but prison staff did not provide extra blankets or linens despite the severe cold. (*Id*. ¶ 51.) Jones notified "supervisors, Deputy Warden Booker, social workers, mental health, [and] Warden Patterson" of the low temperatures and after no action was taken to fix the problem, he filed a grievance. (*Id*. ¶ 52.) Jones

requested to be moved to another facility with heat, but he received no response. (*Id.* ¶ 55.) He also notified a mental health worker, who told Jones she would try to get someone to come see him, but nothing happened. (*Id.* ¶ 57.)

On an unspecified date, Jones "put soap in a sock and began to beat on [his] cell window . . . asking for help." (*Id.* at 20 ¶ 58.) After receiving no response, Jones shattered his cell window, which prompted a response from all the supervisors and block officers. (*Id.* ¶ 59.) Jones was taken to medical and subsequently moved to an observation cell where there was heat. (*Id.* ¶¶ 60-64.) Once the prison fixed the heating system he was released from the observation cell. (*Id.* ¶ 66.) Jones was initially told he would be charged for the broken window, but he was never charged and did not receive a misconduct for the broken window. (*Id.* ¶¶ 67-69.) Jones asserts that when he was returned to F1 unit he was housed "under harsh living conditions until 3-13-25" during which he "had only 2 hours a week out of cell time, no yard was provided, no law library available, no assigned cell cleaning, no tablets provided when [asked], and cell was inadequate and in need of repair (plumbing, ventilation, mold, cracked window)." (*Id.* at 21 ¶ 71.)

Based on the above allegations, Jones asserts Fourteenth Amendment conditions of confinement claims against Warden Patterson, Deputy Warden Booker, and Lt. Sampson.

E

Jones claims that on March 23, 2025, while housed on H2 Unit at P.I.C.C., he approached the unit "bubble" and asked the bubble officer to speak with Sergeant Davis. (*Id.* at 22 ¶ 3.) Jones asked Sergeant Davis for permission to access the law

library that evening at 6 p.m. and presented a letter he received from a district attorney's office, which had been delivered late, indicating Jones had an upcoming deadline to respond to the office's motion to dismiss his PCRA petition. (*Id.* ¶¶ 3-7.) Sergeant Davis refused to sign Jones's law library access slip, saying, "Boy you know I'm not signing shit for you, now go write that up so I can wipe my ass with it, always telling on somebody." (*Id.* ¶ 8.) Jones then filed a grievance "informing the institution that Sgt. Davis, and Defendant Cook has continuously denied [him] law library access on a number of scheduled law library times, as well as other block officers by their influence." (*Id.* ¶ 9.) Plaintiff received no response to his grievance; he filed an appeal, which also received no response. (*Id.* at 23 ¶¶ 10-11.)

Based on the above allegations, Jones asserts First and Fourteenth Amendment access to court claims[6] against Sergeant Davis, CO Cook, Deputy Warden Booker and Warden Patterson. (*Id.* at 37-38.)

F

On April 20, 2025, during recreation time, Jones approached Defendant Cook in his office, requesting to use the law library. (*Id.* at 24 ¶¶ 1-3.) Cook made a phone call, hung up, and told Jones there was no rover to escort him to the law library. (*Id.* ¶ 4.) Jones replied that a rover wasn't required to be escorted to the law library, and Cook told him he was aware, "he just had to make it look good for the camera because he

[6] Jones also asserts his claim under the Sixth Amendment, however Courts generally construe access to courts claims brought by pretrial detainees under the First and Fourteenth Amendments. *See, e.g., Prater v. City of Philadelphia*, 542 F. App'x 135, 137 (3d Cir. 2013) (*per curiam*) (construing pretrial detainee's denial of law library claims "as raising access-to-courts claims under the First and Fourteenth Amendments"). To the extent he intended to allege a Sixth Amendment claim for interference with his right to assistance of counsel, *see id.*, he failed to do so.

knows plaintiff is a Rat and will write it up." (*Id.* ¶¶ 5-6.) Cook then told Jones, "now go sit by the window and bitch like you always do rapist ass, you killing my buzz." (*Id.* ¶ 6.) Jones told Cook to watch how he talked to him. (*Id.* ¶ 7.)

The verbal altercation between Jones and Cook escalated and the two began grappling. (*Id.* at 24 ¶ 8 to 25 ¶ 15.) As several other officers attempted to enter the area to respond to the incident, Cook punched Jones in the face with a closed fist. (*Id.* at 25 ¶¶ 15-17.) Jones fought back, attempting to defend himself. (*Id.* ¶¶ 18-19.) Once the other officers—Sergeant Davis, Officer Bynum, Officer Hall, and non-defendant Officer Robinson—entered the unit, they began helping Officer Cook attack Jones. (*Id.* ¶ 20.) Sergeant Davis "struck [Jones] with [her] elbows, as [Jones] is balled up in the corner" being "punched repeatedly" by Defendants Davis, Hall, and Cook while Defendant Bynum "is pulling [Jones's] shirt over his head." (*Id.* at 26 ¶ 21.) Officer Bynum then ordered Jones to lay on the ground and place his hands behind his back. (*Id.* ¶ 22.) As Jones began complying by putting his hands behind his back, Officer Cook "repeatedly [struck Jones] on the right side of his face[.]" (*Id.* ¶ 23.) Cook had to be restrained by Officer Hall from continuing to strike Jones. (*Id.* ¶ 24.) After this use of force incident, Jones had a "busted lip and a knot on the right side of his temple." (*Id.*)

After being handcuffed, Jones was escorted to the medical unit by Officers Bynum and Robinson. (*Id.* ¶ 25.) The two officers forced Jones's arms "above his head as far as possible, and pushed [him] so low to the floor [that] his knees are touching his chest and he is practically being dragged[,]" from the third floor to the second floor

causing him a groin injury.[7] (*Id.* ¶ 26.) Upon arriving at the medical unit, Jones was "made to place his chest across [the] medical exam table while standing up, still with his arms forced over top of his head from behind." (*Id.* ¶ 27.) Officer Bynum ordered Officer Robinson to keep Jones in that position and then began punching Jones in the rib cage. (*Id.* ¶¶ 27-28.) After Officer Robinson appeared "not comfortable" with Sergeant Bynum's actions, Officers Williams and Pugh came in, and Officer Mink kept watch at the door. (*Id.* ¶ 29 to 27 ¶ 30.) Officer Williams began removing Jones's handcuffs, and as he did so, Officer Bynum punched Jones, knocking him unconscious. (*Id.* at 27 ¶ 31.)

When Jones came to, he was again laid over the examination table but noticed his shirt was off and his pants were pulled down to mid-thigh. (*Id.* ¶ 32.) Jones felt "a sharp pain coming from his rear (anus), and as he looks over his shoulder and sees Defendant Bynum is the cause of this pain, [Jones] immediately began to struggle." (*Id.* ¶ 33.) "Whatever the object Defendant Bynum used to penetrate plaintiff fell to the floor," which Jones believes was a mini flashlight. (*Id.* ¶ 34.) Jones was then "hit with a number of blows, and balled up to protect his face to avoid being knocked out a second time." (*Id.* ¶ 35.) He was struck and injured in the hand and the jaw. (*Id.*) When the attack appeared to be over, Jones peeked out and was struck with a single blow by Officer Hall. (*Id.* ¶ 36.) As the officers tried to escort Jones off the medical unit, Officer

[7] While Jones alleges that Robinson was involved in this use of force incident, Robinson is not listed as a Defendant in the caption of the Complaint or in the list of Defendants, nor is he discussed in the relevant part of the Legal Claims section of the Complaint (*see* Compl. at 35 (asserting a Fourteenth Amendment claim only against Defendant Bynum, for "twisting & Pushing plaintiff cuffed hands behind his back over his head while dragging him down the hall from the 3rd floor to the 2nd floor to medical unit").) Accordingly, the Court does not consider Robinson to be a Defendant in this case.

Sampson stated that they needed to take pictures of him. (*Id.* at 28 ¶ 40.) Jones told Sampson what had just happened but Sampson did not respond. (*Id.* ¶ 41.)

Jones then told Defendants Jane Doe 2 and Jane Doe 3, nurses for YesCare, that they had to examine him and take photos of his injuries, including what he suspected was a fractured jaw, a fractured left hand, and evidence of the physical and sexual assault by the officers. (*Id.* ¶ 42.) The nurses ignored Jones's request. (*Id.* ¶ 43.) Instead, Officer Bynum took one photo of Jones's face, showing only his injured lip, and then the officers escorted Jones to the Property closet. (*Id.* ¶ 44.) Jones asked the officers to have his property transferred to the Restricted Housing Unit and Sergeant Davis said, "don't worry about it, it's going into the trash." (*Id.* ¶ 45.) After being taken to his cell, Jones was denied medical attention and pain medication for his injuries, despite filing numerous requests for medical attention. (*Id.* ¶ 49.) His jaw hurt and he could not eat solid food for over two weeks. (*Id.* at 29 ¶ 55.) His ribs "were discolored and tender, and it hurt for [Jones] to breathe for over a week." (*Id.* ¶ 56.) He was unable to make a fist or lift heavy objects with his left hand for several months, and the hand remains injured. (*Id.* at 28 ¶ 51.) At some point after filing sick call requests and a grievance, Jones received an x-ray at PICC, which reflected that his hand was not fractured. (*Id.* at 29 ¶ 52.) On September 8, 2025, Jones's left hand was examined by a physician at Temple University Hospital, confirming that he had no fracture, but the hand remained weak and the doctor ordered occupational therapy. (*Id.* ¶ 53.) To date, Jones has not been provided with occupational therapy. (*Id.* ¶ 54.) Jones filed a grievance regarding the incident but received no response; he also filed an appeal and did not receive a response. (*Id.* ¶¶ 58-59.) On April 29, 2025, a disciplinary hearing

was held regarding the April 20, 2025 incident, during which Jones exercised his Fifth Amendment right to remain silent, and he was given "45 days punitive, followed by 30 days Administration time." (*Id.* ¶ 60.)

Based on the above allegations, Jones asserts Fourteenth Amendment excessive use of force claims against Defendants Cook, Hall, Bynum, and Davis; Fourteenth Amendment sexual assault claims against Defendants Bynum, Williams and Pugh; a Fourteenth Amendment failure to intervene claim against Defendant Mink; and Fourteenth Amendment denial of adequate medical care claims against Defendants Jane Doe 2 and 3.

G

Jones states that he was left in his cell from April 20 to June 3, 2025 "without any of his personal property and legal material, or basic needs provided by the institution," his cell light was never turned out, and he was unbearably cold due to not having any linens, and the windows being cracked, letting in cold air from outside. (*Id.* ¶¶ 61-62.) Jones notified Lt. Sam, Lt. Sampson, non-Defendant Sgt. Aurelien, Deputy Warden Booker, and Warden Patterson about the missing property and they said they would look into it. (*Id.* ¶ 63.) He was also denied access to the law library during this time, despite notifying his block officers and Defendants Sam, Sampson, Booker, and Patterson that he "is a pro se petitioner and needed access." (*Id.* ¶ 64.)

Jones subsequently filed grievances regarding both the property and law library access issues but received no response. (*Id.* ¶¶ 65-66.) On June 3, 2025, Lt. Sam and Officer Jones finally inventoried Jones's property, however a number of items were missing, including Jones's legal materials. (*Id.* ¶¶ 67-68.) Jones filed a grievance and

then an appeal regarding the missing property. (*Id.* ¶ 72.) Jones informed Warden Patterson of the missing property and the April 20 sexual assault, and she told him to file a grievance, to which he responded that he had already done so. (*Id.* ¶ 73.) Patterson told Jones she hadn't received a grievance on the matter but told him to appeal it and she would look into it. (*Id.* ¶ 74.) Jones never received a response to either his initial grievance or the appeal. (*Id.* at 31 ¶ 75.) Jones later asked Officer Green, the Grievance Coordinator, about the lack of response to his grievances and she told him that, "she hasn't gotten around to it." (*Id.* ¶ 76.) It appears Jones was then transferred to another facility for an unspecified period of time. (*Id.* ¶ 77.)

On August 6, 2025, Jones received a notice regarding attempts to serve him with a 907 intent to dismiss letter since March 11, 2025, and "requesting that the superior court remand the case for further proceeding[s] and permit the PCRA court to perfect service and allow [Jones] time to respond in accordance with Pa. R. Crim. Pro. 907." (*Id.* ¶ 79.) Jones states that his "appeal was premature due to [PICC's] failure to provide law library [access], nor docket entries [allowing] incarcerated persons . . . to follow appeal, and [he] request[ed] for extension of time due to receiving legal mail late." (*Id.* ¶ 80.) On August 7, 2025, Jones received another letter from the Superior Court stating that the deadline to file briefs in his PCRA case was September 16, 2025. (*Id.* ¶ 81.) Jones prepared a request for extension of time, explaining to the court that all his legal materials had been lost. (*Id.* ¶¶ 82-83.) While he was awaiting the court's response, on September 22, 2025, Jones received another letter from the Superior Court stating that due to Jones's "failure to respond to the order [as] requested by the court

on August 22, 2025, his appeal was quashed as interlocutory." (*Id.* at 32 ¶ 84.) Jones states that he "seeks redress in court." (*Id.* ¶ 85.)

Based on the above allegations, Jones asserts Fourteenth Amendment due process claims against Lt. Sam, Lt. Sampson, Deputy Warden Booker, and Warden Patterson based on failure to return his property; a Fourteenth Amendment due process claim against Defendant Green based on the failure to process his grievances; a First Amendment retaliation claim against CO Cook and Sergeant Davis, and First and Fourteenth Amendment access to court claims against Defendants Sam, Sampson, Booker, and Patterson.

Jones seeks: (1) a declaration that the Defendants' acts and omissions violate Jones's rights;[8] (2) preliminary and permanent injunctions ordering Cook, Williams, Pugh, Hall, Davis, Bynum, and Morrison to "cease their physical violence, threats, & retaliatory behavior towards [him]"; (3) preliminary and permanent injunctions ordering Patterson to assign Jones to a single cell; (4) preliminary and permanent injunctions "ordering Defendants Jane Doe, Lt. Sampson, Lt. McMichaels, Lt. Singh, Lt. Sam, CO Green, Sgt Davis, Warden Patterson, & Deputy Warden Booker to process and/or respond" to Jones's grievances and appeals, and to investigate various alleged

[8] Declaratory relief is unavailable to adjudicate past conduct, so Jones's request is improper to that extent. *See Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*) ("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant simply to proclaim that one party is liable to another."); *see also Andela v. Admin. Office of U.S. Courts*, 569 F. App'x 80, 83 (3d Cir. 2014) (*per curiam*) ("Declaratory judgments are meant to define the legal rights and obligations of the parties in the anticipation of some future conduct."). A declaratory judgment is also not "meant simply to proclaim that one party is liable to another." *Corliss*, 200 F. App'x at 84 (*per curiam*); *see also Taggart v. Saltz*, No. 20-3574, 2021 WL 1191628, at *2 (3d Cir. Mar. 30, 2021) (*per curiam*) ("A declaratory judgment is available to define the legal rights of the parties, not to adjudicate past conduct where there is no threat of continuing harm.").

misconduct by inmates and prison staff at PICC; (5) preliminary and permanent injunctions ordering John Doe, Jane Doe 2, and Jane Doe 3 to provide various enumerated forms of medical care to inmates when needed; (6) preliminary and permanent injunctions ordering Jane Doe and Warden Patterson to comply with prison disciplinary hearing procedures and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973); and (7) nominal, compensatory, and punitive damages. (*Id.* at 39-40.)

II

The Court will grant Jones leave to proceed *in forma pauperis* because it appears that he is incapable of paying the fees to commence this civil action.[9] Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim. Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 560 U.S. 544, 556 (2007)). At this early stage of the litigation, the Court will accept the facts alleged in the *pro se* Amended Complaint as true, draw all reasonable inferences in Jones's favor, and ask only whether the Complaint contains facts sufficient to state a plausible claim. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021),

[9] Because Jones is incarcerated, he will be obligated to pay the filing fee in installments in accordance with the Prison Litigation Reform Act. *See* 28 U.S.C. § 1915(b).

*abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197, 204 (3d Cir. 2024). Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678.

Because Jones is proceeding *pro se*, the Court construes his allegations liberally. *See Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)). The Court will "apply the relevant legal principle even when the complaint has failed to name it." *Id.* (quoting *Mala*, 704 F.3d at 245). However, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Id.* (quoting *Mala*, 704 F.3d at 245). An unrepresented litigant "cannot flout procedural rules — they must abide by the same rules that apply to all other litigants." *Mala*, 704 F.3d at 245; *see also Doe v. Allegheny Cnty. Hous. Auth.*, No. 23-1105, 2024 WL 379959, at *3 (3d Cir. Feb. 1, 2024) (*per curiam*) ("While a court must liberally construe the allegations . . . this does not require the court to act as an advocate to identify any possible claim that the facts alleged could potentially support.").

III

Jones asserts constitutional claims. The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983. "Section 1983 provides a civil remedy for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Halsey v. Pfeiffer,* 750 F.3d 273, 290 (3d Cir. 2014) (quoting 42 U.S.C. § 1983); *see also Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005) (explaining § 1983 "is not itself a source of substantive rights, but [rather] a method for vindicating federal rights elsewhere conferred." (quoting *Baker v. McCollan,* 443 U.S. 137, 145 n. 3 (1979))). To state a claim under § 1983, a plaintiff must demonstrate "that the

defendants, acting under color of law, violated the plaintiff's federal constitutional or statutory rights, and thereby caused the complained of injury." *Karns v. Shanahan,* 879 F.3d 504, 520 (3d Cir. 2018) (quoting *Elmore,* 399 F.3d at 281); *see also Halsey,* 750 F.3d at 290 ("To state a claim under section 1983, a plaintiff must demonstrate that 'some person has deprived him of a federal right . . . [and] that the person who has deprived him of that right acted under color of state or territorial law.'" (quoting *Gomez v. Toledo,* 446 U.S. 635, 640 (1980))).

A

Jones sues all Defendants in their individual and official capacities. (*See* Compl. at 2-5.) Claims against municipal employees named in their official capacities are indistinguishable from claims against the governmental entity that employs them, here the City of Philadelphia. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n. 55 (1978))). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.*

To state a claim for municipal liability, a plaintiff must allege that the defendant's policies or customs caused the alleged constitutional violation. *See Monell*, 436 U.S. at 694; *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003). The plaintiff "must identify [the] custom or policy, and specify what exactly that custom or policy was" to satisfy the pleading standard. *McTernan v. City of York,* 564 F.3d 636, 658 (3d Cir. 2009). Jones fails to allege that he suffered a constitutional

violation due to a policy or custom of the City of Philadelphia. Accordingly, his official capacity claims are not plausible and are dismissed without prejudice.

B

Jones alleges conditions of confinement claims against Deputy Warden Booker, Warden Patterson, and Lt. Sampson. The Due Process Clause of the Fourteenth Amendment governs claims brought by pretrial detainees. *Hubbard*, 399 F.3d at 166. To establish a basis for a Fourteenth Amendment violation, a prisoner must allege that his conditions of confinement amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 538 (1979). "Unconstitutional punishment typically includes both objective and subjective components." *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007). "[T]he objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind." *Id.* (internal quotations and alterations omitted).

In that regard, a "particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose." *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) (quoting *Stevenson*, 495 F.3d at 68), *abrogation on other grounds recognized by Fisher*, 115 F.4th at 204; *Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017). Courts should consider the totality of the circumstances in evaluating such a claim. *Bistrian*, 696 F.3d at 373 ("In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution."). Furthermore, "[i]n determining whether

restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion," courts are obligated to keep in mind that "such considerations are peculiarly within the province and professional expertise of corrections officials . . . ." *Stevenson*, 495 F.3d at 68 n.3.

Jones alleges that he was kept in "freezing cold temperatures for weeks" starting on December 25, 2024, causing him to shiver to the point of exhaustion, while correctional staff wore winter coats, hats, and gloves. (Compl. at 19 ¶¶ 47, 48, 53.) There is no allegation suggesting that keeping Jones in a freezing cold cell for several weeks with no additional blankets or other mitigating measures was reasonably related to institutional security or another legitimate governmental need. And while cold temperatures alone do not generally violate an inmate's constitutional right, *see, e.g., Hunter v. Schullery*, No. 24-2139, 2025 WL 3281830, at *6 (D.N.J. Nov. 25, 2025) (noting that "an inmate's exposure to cold conditions does not, absent more, violate the Eighth Amendment"), Jones asserts that he was subjected to freezing cold temperatures for weeks during the winter months causing him physical exhaustion and pain, which plausibly alleges the kind of "extreme deprivation" that rises to the level of a constitutional violation, *see Freeman v. Miller*, 615 F. App'x 72, 79 (3d Cir. June 3, 2015) (*per curiam*). Further, Jones alleges that he repeatedly alerted Booker, Patterson, and Sampson to the severity of his conditions and they took no action. He therefore states a plausible conditions of confinement claim based on this period of time. *See Sampson v. Berks Cnty. Prison*, 171 F. App'x 382, 385 (3d Cir. 2006) (*per curiam*) (reversing dismissal of a § 1983 conditions of confinement claim by prisoner

who was subjected to "unreasonably low" temperatures in his cell for 11 days, and where prison officials refused to provide additional clothes, move the plaintiff to another cell, or do anything else to ameliorate the conditions).

Jones appears to assert a separate conditions of confinement claim based on being confined in the RHU from April 20, 2025 to June 3, 2025, during which the "cell light was never turned out, and he was unbearably cold due to not having linens, and the windows being cracked letting in cold air from the outside." (Compl. at 29 ¶ 62.) However, these sparse allegations do not state a plausible claim. Unlike the physical exhaustion and pain Jones experienced as a result of having no heat for several weeks during winter, Jones does not allege facts suggesting that the cold air blowing into his cell during several weeks in the spring and early summer was an "extreme deprivation" posing a risk to his health and safety. "Inmates 'have a right to adequate ventilation and a right to be free from extreme hot and cold temperatures[,] . . . '[b]ut the Constitution does not give inmates the right to be free from all discomfort.'" *Carroll v. Delaware Cnty. of Pa.*, No. 22-1720, 2023 WL 2868020, at *11 (E.D. Pa. Apr. 10, 2023) (citation omitted); *see also May v. George W. Hill Corr. Facility*, No. 22-5007, 2023 WL 2574979, at *3 (E.D. Pa. Mar. 20, 2023) (dismissing conditions of confinement claim where for a two-week period the plaintiff "had to sleep without blankets, sheets, towels, and/or rags" in "freezing cold" air temperatures, explaining that "[a]lthough the conditions described by May may not be pleasant or desirable, his allegations accepted as true fail to allege how the complained of conditions were 'sufficiently serious' to pose a substantial risk of serious harm to his health or safety, or that any Defendant knew of and disregarded that risk.") While Jones asserts that his cell was "unbearably cold,"

this vague allegation is insufficient to allege that the conditions he faced were sufficiently severe or prolonged to violate his constitutional rights. *See Burkholder v. Newton*, 116 F. App'x 358, at *5 (3d Cir. Nov. 24, 2024) (dismissing Eighth Amendment claim based on exposure to temperatures so cold they caused pain in plaintiff's leg and an unsanitary toilet for thirty days, noting "[i]t is questionable if having a cold cell or a toilet that backs up sometimes is really an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life." (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)); *see also Bracey v. Sec'y Pa. Dep't of Corrs.*, 686 F. App'x 130, 136 (3d Cir. 2017) (*per curiam*) (holding that allegedly cold conditions in cell did not violate the Eighth Amendment, absent showing that conditions were extreme). Moreover, while Jones asserts that he "notified Lt Sam, Lt Sampson, Sgt Aurelien, Deputy Warden Booker, and Warden Patterson when they made their rounds, that [his] property was never inventoried, nor received for weeks," (Am. Compl. at 29 ¶ 63), and also notified him of his lack of law library access, (*id.* ¶64), he does not claim he told anyone of the cold conditions in his cell during this time, so as to plausibly allege that any Defendant was deliberately indifferent to an unreasonable risk of harm. *See id.* Without more, his Fourteenth Amendment claim based on this period of his confinement is not plausible and will be dismissed without prejudice.

Jones also asserts a conditions of confinement claim based on being housed "under harsh living conditions until 3-13-25" during which he "had only 2 hours a week out of cell time, no yard was provided, no law library available, no assigned cell cleaning, no tablets provided when [asked], and cell was inadequate and in need of repair (plumbing, ventilation, mold, cracked window)." (*Id.* at 21 ¶ 71.) These claims

are likewise undeveloped and not plausible. It is unclear how long the conditions Jones refers to persisted except that they continued "until 3-13-25." And Jones's vague allegation that the cell was "inadequate" and his references to "in need of repair (plumbing, ventilation, mold, cracked window)" fail to allege that the conditions posed a substantial risk of serious harm or that he was denied any basic needs. *See Hall-Wadley v. Maint. Dep't*, 386 F. Supp. 3d 512, 519 (E.D. Pa. 2019) (concluding that plaintiff's allegation that "black mold exists in the shower" was not sufficient to state a Fourteenth Amendment claim where the plaintiff did not allege that he suffered any harm from the mold); *see also Carter v. Owens*, No. 17-0182, 2017 WL 3107204, at *9 (D.N.J. July 21, 2017) (dismissing conditions of confinement claim based on, *inter alia*, poor ventilation in a cell because "Plaintiff has offered no facts to demonstrate that the 'lack of ventilation' was sufficiently serious" to present a threat to his health or safety). Without more, his conditions of confinement claim based on these allegations will be dismissed, with leave to amend.

C

Jones asserts several claims based on prison officials' failure to process or adequately respond to his grievances and appeals. Any claims based on the handling of prison grievances fail because "prisoners do not have a constitutional right to prison grievance procedures." *Gerholt v. Wetzel*, 858 F. App' x 32, 34 (3d Cir. 2021) (*per curiam*) (citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) and *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (*per curiam*)); *Woods v. First Corr. Med. Inc.*, 446 F. App' x 400, 403 (3d Cir. 2011) (*per curiam*) ("We agree with the District Court that because a prisoner has no free-standing constitutional right to an

effective grievance process, Woods cannot maintain a constitutional claim against Lucas based upon his perception that she ignored and/or failed to properly investigate his grievances." (internal citation omitted)). Further, a prison official's participation in the grievance process, failure to take action in response to a prisoner's letter about the conditions in which he is confined, or failure to act after becoming aware of an employee's actions, is generally an insufficient basis upon which to base those officials' personal involvement in the underlying violations. *See Murray v. McCoy*, No. 23-2582, 2024 WL 1328231, at *3 (3d Cir. Mar. 28, 2024) ("Superintendent Ransom's awareness of Murray's allegations concerning C.O. McCoy, without more, is insufficient to establish personal involvement" (citing cases)); *Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (*per curiam*) ("Although some of these defendants were apparently involved in responding to some of Folk's prison grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews."); *Curtis v. Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (*per curiam*) ("The District Court properly determined that Defendants [Superintendent] Wenerowicz, Lewis, and Shaylor – who participated only in the denial of Curtis' grievances – lacked the requisite personal involvement [in the conduct at issue]."); *Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (*per curiam*) (defendants' alleged inappropriate responses to plaintiff's "later-filed grievances" were insufficient to establish those defendants' personal involvement in underlying wrongs); *Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at *2 (3d. Cir. Nov. 28, 2022) (*per curiam*) ("Contrary to Robinson's assertions, awareness of a grievance or complaint after the allegedly unconstitutional conduct has occurred, without more, is insufficient to

establish personal involvement."). Accordingly, Jones's claims based solely on prison officials' involvement in the grievance process are not plausible and will be dismissed.

D

Jones asserts several claims based on a failure to investigate his grievances and verbal complaints. In particular, he alleges that Lt. Sampson, Deputy Warden Booker and Warden Patterson failed to investigate "physical and sexual assault against [him] by Correctional Officers after all defendants were notified of events, verbally, by grievance, request of staff, & PREA hotline[.]" (Compl. at 37.) He also asserts a Fourteenth Amendment claim against Lt. Singh for "failure to report and/or investigate [Jones] being stabbed and/or the use of weapons involved in [the September 12, 2024 incident]"). (Am. Compl. at 32.) These claims must be dismissed with prejudice because there is no constitutional right to an investigation. *See Mitchell v. McNeil*, 487 F.3d 374, 378 (6th Cir. 2007) ("There is no statutory or common law right, much less a constitutional right, to an investigation."); *Graw v. Fantasky*, 68 F. App'x 378, 383 (3d Cir. 2003) ("[A]n allegation of a failure to investigate, without another recognizable constitutional right, is not sufficient to sustain a section 1983 claim." (quotations omitted)). In addition, simply alleging that the Defendants were notified of alleged constitutional violations after they happened does not plausibly allege the Defendants' personal involvement in the underlying harm. *See Ricker v. Weston*, 27 F. App'x 113, 119-20 (3d Cir. 2002) (concluding that a decision not to discipline does not establish personal involvement "given that all of the injuries occurred before the decision" and "[t]here is simply no causal link between those injuries and what [the defendants] did or did not do"); *Williams v. Wetzel*, No. 23-1235, 2025 WL 908406, at *2 (W.D. Pa. Mar.

26, 2025) ("[A]fter-the-fact notice is not sufficient to establish personal involvement."). Accordingly, the failure to investigate claims asserted against Defendants Singh, Sampson, Booker, and Patterson, or any other Defendant for failure to investigate are not plausible and must be dismissed with prejudice.

E

Read liberally, Jones asserts Fourteenth Amendment due process claims based on the disciplinary processes arising from the September 12, 2024 and December 11, 2024 inmate violence incidents. "Generally, prisons may sanction a pretrial detainee for misconduct that he commits while awaiting trial, as long as it is not a punishment for the 'underlying crime of which he stands accused.'" *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018) (quoting *Rapier v. Harris*, 172 F.3d 999, 1003-06 (7th Cir. 1999)). "However . . . disciplinary segregation for violation of prison rules and regulations cannot be imposed without providing the procedural due process protections set forth in *Wolff v. McDonnell* . . . [including] . . . the right to receive written notice of the charges at least 24 hours before the hearing, the opportunity to present witnesses and documentary evidence, and a written statement of the reasons for the disciplinary action taken and the supporting evidence." (*Id.*) (noting that the procedural protections afforded to convicted prisoners in *Wolff* also apply to pretrial detainees). "[T]he filing of a fraudulent misconduct report and related disciplinary sanctions do not without more violate due process." *Seville v. Martinez*, 130 F. App'x 549, 551 (3d Cir. 2005) (*per curiam*). Instead, "[d]ue process is satisfied where an inmate is afforded an opportunity to be heard and to defend against the allegedly false misconduct reports." *See Lewis v. Connections*, No. 19-1273, 2020 WL 2332585, at *6 (D. Del. May 11, 2020) (dismissing

pretrial detainee's procedural due process claim based on the filing of a false disciplinary report (quoting *Thomas v. McCoy*, 467 F. App'x 94, 97 (3d Cir. 2012) (*per curiam*)).

1

Jones alleges that Officer Cook filed a false misconduct report regarding the September 12, 2024 incident, resulting in Jones being charged with, and ultimately found guilty of unspecified disciplinary violations. He also asserts that Jane Doe, the hearing officer at his informal disciplinary hearing on September 19, 2024, found him guilty without reviewing the surveillance video from the incident. The Court understands him to assert Fourteenth Amendment procedural due process claims on both grounds.

To the extent that Jones asserts a due process claim based on being falsely charged with disciplinary violations, that claim is not plausible. As noted above, so long as an inmate has "an opportunity to be heard and to defend" against false disciplinary charges, he does not suffer a procedural due process violation. *Lewis*, 2020 WL 2332585 at *6. Jones's allegations reflect that he received notice of the misconduct several days before the informal disciplinary hearing, and that at the hearing he was able to provide his account of the September 12, 2024 incident, including describing the inaccuracies in the incident report. (Compl. at 9 ¶¶ 37-39.) Thus, the assertion that Cook filed a false misconduct report does not by itself plausibly allege a Fourteenth Amendment violation. *See Richardson v. Sherrer*, 344 F. App'x 755, 758 (3d Cir. 2009) (*per curiam*) (affirming dismissal of Fourteenth Amendment due process claims where the plaintiff "[did] not allege that he was denied a hearing or

an opportunity to present a defense."); *see also Smith*, 293 F.3d at 653–54 (noting that "due process is satisfied where an inmate is afforded an opportunity to be heard and to defend against the allegedly falsified evidence and groundless misconduct reports")

His claim that Jane Doe did not review the surveillance footage from the September 12, 2024 incident also fails to allege a plausible due process violation. "[A]n inmate's right to procedural due process is violated when a hearing examiner simply fails to view available evidence to determine its relevance and suitability for use at a disciplinary hearing[,]" relying instead on a correctional officer's contention that it is not relevant. *Burns v. PA Dep't of Corr.*, 642 F.3d 163, 174 (3d Cir. 2011). Here, however, Jones has not specified the nature of the charges against him so as to plausibly allege the relevance of the surveillance video. *Id.* at 173 (noting that "[t]he requested tape appeared relevant because [plaintiff] alleged that [the Captain of Security] told him that the assault was recorded by surveillance cameras. [Plaintiff] claims that the videotape would have exonerated him because it would have shown the real assailant."); *see also Crosby v. Warden Lewisburg USP*, 788 F. App'x 816, 818 (3d Cir. 2019) (affirming dismissal of procedural due process claim based on a hearing officer's decision not to review video evidence, where plaintiff did not allege the video was relevant to the disciplinary charges). To the extent that Jones can allege additional facts reflecting the relevance of the video evidence to the charges against him in the September 19, 2024 disciplinary hearing, he may do so in an amended complaint.[10]

[10] Jones also asserts a due process violation based on the failure to provide him with sanction and appeal forms. However, "[p]risoners have no constitutional right to a grievance process, and prison officials' refusal to provide grievance forms or to respond to

2

Jones also alleges procedural due process claims based on being falsely charged with various disciplinary charges following the December 11, 2024 inmate violence incident. He asserts that Officer Lee misrepresented the facts of the incident in her incident report. He also contends that Disciplinary Hearing Officer Jane Doe again failed to review the video evidence, which would have rebutted at least some of the charges against him, including "possession or introduction of a weapon" and "refusal to comply with orders." (Compl. at 17 ¶¶ 32, 34.) Further, he alleges that Doe found him guilty of misconduct without providing any written reasons for the finding. (*Id*. at 18 ¶ 40.) For the same reasons discussed above, Officer Lee's filing of false disciplinary charges does not by itself plausibly allege a due process violation. However, Jones's allegation that Jane Doe failed to review the video evidence in his case, despite its apparent relevance to at least some of the charges against him, asserts a plausible due process claim. *See Burns*, 642 F.3d at 174. Further, the allegation that Doe did not provide written reasons for her guilty finding in imposing 60 days of disciplinary segregation on Jones also alleges a plausible violation of the due process protections provided under *Wolff*. *See Kanu*, 739 F. App'x at 116. Jones's procedural due process claim based on the September 19, 2024 disciplinary hearing will therefore pass statutory screening.

---

inmate complaints does not constitute a due process violation." *Allen v. Warden of Dauphin Cnty. Jail*, No. 07-1720, 2008 WL 4452662, at *5 (M.D. Pa. Sept. 29, 2008) (citing cases)

F

Jones asserts that he was denied access to the PICC law library on several occasions. "Under the First and Fourteenth Amendments, prisoners retain a right of access to the courts." *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008) (*per curiam*) (citing *Lewis v. Casey*, 518 U.S. 343, 346 (1996)). "The Supreme Court has recognized that 'adequate law libraries' are a component of the right of access to the courts." *O'Connell v. Williams*, 241 F. App'x 55, 57 (3d Cir. 2007) (*per curiam*) (quoting *Bounds v. Smith,* 430 U.S. 817, 828 (1977)). Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis*, 518 U.S. at 351. Accordingly, "prisoners may only proceed on access-to-courts claims in two types of cases, challenges (direct or collateral) to their sentences and conditions of confinement," *Monroe*, 536 F.3d at 205 (citing *Lewis*, 518 U.S. at 354-55), because the inability to litigate claims other than an attack on a sentence or conditions of confinements "is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration," *Lewis*, 518 U.S. at 355; *see also Shane v. Fauver*, 209 F. App'x 87, 89 (3d Cir. 2006) (*per curiam*) ("[T]he actual injury requirement is not met by every type of frustrated legal claim; constitutional protections are applied only to a prisoner's direct or collateral attack on his or her sentence, or challenges to prison conditions" (citing *Lewis*, 518 U.S. at 354-55)).

"A prisoner making an access-to-the-courts claim is required to show that the denial of access caused actual injury." *Jackson v. Whalen*, 568 F. App'x 85, 87 (3d Cir.

2014) (*per curiam*) (quoting *Lewis*, 518 U.S. at 350). This is because the right of access to the courts "rest[s] on the recognition that the right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). In other words, a prisoner claiming that he was denied access to the courts must allege an injury traceable to the conditions of which he complains. *Diaz v. Holder*, 532 F. App'x 61, 63 (3d Cir. 2013) (*per curiam*) (affirming dismissal of denial of access claims where plaintiff failed to tie alleged deficiencies in library to harm in underlying action). In general, an actual injury occurs when a prisoner demonstrates that a "nonfrivolous" and "arguable" claim was lost because of the denial of access to the courts. *Christopher*, 536 U.S. at 415. "[T]he underlying cause of action, . . . is an element that must be described in the complaint." *Id.*; *cf. Prater*, 542 F. App'x at 137 (affirming denial of access-to-courts claim where the pretrial detainee had "not offered any other explanation of how his inability to access the library affected his criminal proceedings").

Jones's claims based on denial of his access to the law library are not plausible. He asserts that he was denied law library access for 75 days while in solitary confinement sometime in late 2024 or early 2025, (Compl. at 18 ¶¶ 44-45), however there is no allegation that the denial caused him any injury to a non-frivolous legal claim. Jones also asserts that some time in early 2025 he was housed "under harsh conditions" which included "no law library available." (*Id.* at 21 ¶ 71.) It is unclear whether this involves a separate time period than the 75 days of solitary confinement. In any event, Jones again does not allege that the denial of law library access caused the loss of any viable legal claim.

Similarly, Jones alleges that from April 20, 2025 to June 3, 2025, he was denied access to the law library but does not allege any facts suggesting this prejudiced his ability to pursue a non-frivolous claim. (*Id*. at 29 ¶ 61 to 30 ¶ 66.) Finally, Jones alleges that on March 23, 2025, he requested law library access from Sgt. Davis so that he could respond to a "907 notice to dismiss"[11] his PCRA petition. (*Id*. at 22 ¶¶ 1-9.) He asserts that Sgt. Davis denied his request and that this caused him a delay in filing a response to the 907 motion, (*see id*. at 37), but again, there is no allegation that the denial of law library access caused Jones to lose a non-frivolous legal claim.[12] Jones also alleges that on August 6, 2025, he received a notice about "unsuccessful attempts to serve him with [a] 907 intent to dismiss letter since March 11, 2025, and requesting that the superior court remand the case for further proceeding . . . ." (Compl. at 31 ¶ 79.) He adds that an unspecified, "appeal was premature due to facilities (P.I.C.C.) failure to provide law library, nor docket entries to incarcerated persons (stating there is a policy that doesn't allow them to provide docket sheet) to follow appeal, and request for Extension of time due to receiving mail late." (*Id*. ¶ 80.) Jones also alleges that

[11] Jones is likely referring to a notice filed pursuant to Pennsylvania Rule of Criminal Procedure 907, seeking dismissal of his Post Conviction Relief Act ("PCRA") petition without a hearing. *See* Pa. R. Crim. P. 907.

[12] Indeed, the public docket for Jones's case reflects that he or his counsel successfully filed a motion for extension of time on March 21, 2025 and his PCRA petition was not adjudicated until November 20, 2025. *Commonwealth v. Miller*, CP-51-CR-0015857-2013 (Phila. C.P.). Moreover, the docket reflects that from May 20, 2024 to May 19, 2025, Jones was represented by attorney Gina Amoriello, which is sufficient to satisfy his right to First and Fourteenth Amendment rights to access the courts. *See Diaz*, 532 F. App'x at 63 (explaining that "an adequate prison law library is but one of many acceptable ways to satisfy [an inmate's] right to access the courts. The right can be satisfied instead, for example, by appointing the [inmate] an attorney."). He is also proceeding with counsel in his more recent case, *Commonwealth v. Miller*, CP-51-CR-00006254-2024 (Phila. C.P.).

while he was awaiting the court's response to his request for extension of time, on September 22, 2025, he received another letter from the Superior Court stating that due to his "failure to respond to the order [as] requested by the court on August 22, 2025, his appeal was quashed as interlocutory." (*Id.* at 32 ¶ 84.) To the extent discernible, Jones alleges that due to delays caused by prison officials, his appeal was quashed or dismissed as interlocutory (i.e. premature) rather than on the merits. He therefore does not plead that he lost the appeal as a result of prison officials' actions since he acknowledges that he filed his appeal prematurely. In any event, Jones does not allege the substance of his appeal so as to plead that his legal claim was nonfrivolous. *See Monroe*, 536 F.3d at 205-06 (explaining that to state a plausible access to courts claim, "[t]he Complaint must describe the underlying arguable claim well enough to show that it is 'more than mere hope,' and it must describe the 'lost remedy.'"); *see also Booze v. Wetzel*, No. 12-1307, 2014 WL 2472049, at *4 (M.D. Pa. June 3, 2014) (dismissing access to courts claim where "Plaintiff . . . fails to allege that his underlying claims were non-frivolous or arguable; instead, he alleges only that his claim was denied and that he couldn't have perfected his claim without the papers"). Jones's claims based on denial of law library access are not plausible and will be dismissed.

G

Jones alleges excessive force claims against the officers involved in the April 20, 2025 incident. Excessive force claims brought by convicted prisoners are analyzed under the Eighth Amendment's Cruel and Unusual Punishment Clause, while claims brought by pretrial detainees are analyzed under the Fourteenth Amendment's Due

Process Clause. *See Kingsley*, 576 U.S. at 400-01; *Jacobs v. Cumberland County*, 8 F.4th 187, 193-94 (3d Cir. 2021). The distinction is significant because the "language of the two Clauses differs, and the nature of the claims often differs." *Kingsley*, 576 U.S. at 400. When a convicted prisoner brings an Eighth Amendment excessive force claim against a prison official, the court must consider "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillan*, 503 U.S. 1, 7 (1992). The malicious-and-sadistic standard for an Eighth Amendment claim is subjective, but an objective standard is applied to a Fourteenth Amendment claim. *See Kingsley*, 576 U.S. at 400 (explaining that the reason for the lesser standard in a Fourteenth Amendment claim is that "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically'"); *Jacobs*, 8 F.4th at 194 ("In 2015, the Supreme Court clarified that the subjective Eighth Amendment standard does not apply to pretrial detainees.").

For a pretrial detainee to state a due process violation based on excessive force, he must allege plausibly that "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 at 396-97. The following circumstances "may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 397. Whether unreasonable force has been used against a detainee "requires 'careful attention to the facts and circumstances of each particular case.'" *Jacobs*, 8 F.4th at 194 (quoting

*Graham v. Connor*, 490 U.S. 386, 396 (1989)). Courts should analyze "these circumstances 'from the perspective of a reasonable officer on the scene'" while keeping in mind that decisions about safety and order require the expertise of correctional officers, "'who must have substantial discretion to devise reasonable solutions to the problems they face.'" *Id.* at 195 (quoting *Kingsley*, 576 U.S. at 397 & 399).

Jones alleges facts suggesting he engaged in an argument and then a physical altercation with Officer Cook. While there is no question that some amount of force may be justified when a correctional officer faces a resisting or violent inmate, where the use of force continues after the inmate has been subdued or has stopped resisting, it may be unreasonable under the Fourteenth Amendment. Here, Jones alleges that while he was "balled up in the corner" of the unit, he was "punched repeatedly by Defendants Davis, Hall and Cook while Defendant Bynum pull[ed] [his] shirt over his head." (Compl. at 25 ¶ 21.) Further, after Jones had begun putting his hands behind his back in compliance with the officers' orders, Defendant Cook "repeatedly [struck] [Jones] in the right side of his face[.]" (*Id.* ¶¶ 22-23.) He also asserts that after officers brought him to the medical examination room, Sgt. Bynum struck Jones in his rib cage several times, resulting in significant bruises, and punched him so hard that he lost consciousness. (*Id.* ¶ 28; *id.* at 27 ¶ 32; *id.* at 29 ¶ 56.) In each of these instances, the allegations suggest that Jones did not present any threat to the correctional officers present, who significantly outnumbered him. Thus, Jones has alleged sufficient facts to raise a plausible claim based on the use of force by Officer Davis, Hall, Cook and Bynum in the April 20, 2025 incident.

Read liberally, Jones also asserts an excessive force claim against Defendants Bynum based on how he escorted Jones from H2 Unit to the medical examination room. Jones asserts that they "forced [his] arms . . . above his head as far as possible, and pushed [him] so low to the floor [that] his knees are touching his chest he is practically being dragged from the 3d floor unit to medical, which is on the 2nd floor of the facility, which [caused] plaintiff [to] sustain[] a groin injury." (*Id*. at 26 ¶¶ 25-26.) The factual allegations do not suggest that Jones was resisting the officers, or that there was any legitimate penological reason Jones needed to be dragged by his arms in a manner that would cause him injury. At this preliminary stage, Jones plausibly alleges that the force used by Bynum was unreasonable in the circumstances.

H

Jones asserts a sexual assault claim against Defendants Bynum, Williams, and Pugh based on the April 20, 2025 incident. Sexual abuse and harassment violate an inmate's constitutional rights. *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018) ("Whether sexual abuse of inmates by prison officials offends the Eighth Amendment is a matter of first impression in our Court. Today, we join numerous sister Circuits in holding that prison sexual abuse can violate the Constitution."); *see White v. Massini*, No. 22-1230, 2022 WL 1103793, at *2 (E.D. Pa. Apr. 13, 2022) (analyzing pretrial detainee's sexual assault claim under the Fourteenth Amendment's Due Process Clause). Claims for sexual abuse and harassment are evaluated similarly to excessive force claims in that the prisoner must allege facts plausibly establishing both objective and subjective components. *Ricks*, 891 F.3d at 475 (stating that the misconduct "must be objectively, sufficiently intolerable and cruel, capable of causing harm, and the

official must have a culpable state of mind”). Regarding the subjective component, the Court “consider[s] whether the official had a legitimate penological purpose or if he or she acted ‘maliciously and sadistically for the very purpose of causing harm.’” *Id*. at 475 (quoting *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986)). Regarding the objective prong, the Court considers whether the action is “repugnant to the conscience of mankind” or whether it is “sufficiently serious or severe.” *Id*. at 475-77 (citations omitted). “Plausible allegations of sexual assault meet the standard of impermissible punishment because sexual assault cannot and does not serve a legitimate governmental objective.” *White*, 2022 WL 1103793, at *3; *see also Ricks*, 891 F.3d at 471 (“Our society requires prisoners to give up their liberty, but that surrender does not encompass the basic right to be free from severe unwanted sexual contact.”)

Here, Jones alleges that Sgt. Bynum penetrated his anus with a mini flashlight while Officers Williams and Pugh held him down. There is no suggestion in the Complaint that there was any penological justification for these actions, which were degrading and humiliating to Jones. Jones alleges that Bynum subjected him to severe unwanted sexual contact and that Williams and Pugh assisted in the assault. He therefore plausibly alleges a Fourteenth Amendment sexual assault claim against these three Defendants that will pass statutory screening.

I

Jones alleges that prison officials failed to protect him from harm by other inmates in three separate incidents. For a failure to protect claim against a prison official to be plausible, a plaintiff must allege that: (1) the conditions in which he was incarcerated posed a substantial risk of serious harm; (2) the prison official acted with

deliberate indifference to that substantial risk of serious harm; and (3) the official's deliberate indifference caused harm. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997); *see also Paulino v. Burlington Cnty. Jail*, 438 F. App'x 106, 109 (3d Cir. 2011) (applying deliberate indifference standard to failure to protect claims brought by pretrial detainees); *see also Bistrian*, 696 F.3d at 367 (same). Deliberate indifference in the context of a failure to protect claim is a subjective standard that requires the plaintiff to allege plausibly that the defendant prison officials "must actually [have been] aware of the existence of the excessive risk; it is not sufficient that [prison officials] should have been aware." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001). "However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Id.* (citing *Farmer*, 511 U.S. at 844).

1

Jones alleges a failure to protect claim against Cook based on the September 12, 2024 incident in which Cook failed to stop other inmates from harming him or to call for backup. Jones alleges that Cook failed to lock up I.P.3 and I.P.4 despite them having been involved in a violent altercation with two other inmates. He also alleges that Cook was close by when the two inmates began threatening Jones verbally and were circling him, preparing to attack. Nevertheless, Cook neither intervened to stop the attack nor called for help after I.P. 4 attacked Jones. Jones therefore plausibly alleges that Cook was aware of a serious risk of harm but disregarded the risk, resulting in Jones's injuries. This claim will therefore pass statutory screening.

Jones also asserts a failure to protect claim based on Officer Morrison sharing Jones's criminal charges with other inmates on his unit. Jones alleges that Morrison showed the inmates that he was being charged with rape and told him he better go into protective custody or else he would die. As a result of Morrison's actions, inmates threatened to attack Jones; he also alleges he was denied access to the law library, treated differently by female prison officials, and was left in his cell during recreation periods. The United States Court of Appeals for the Third Circuit has noted that "the sex offender label is stigmatizing in the prison context, and that prison norms may call for the assault of sex offenders." *Moore v. Mann*, 823 F. App'x 92, 96 (3d Cir. 2020) (reversing the district court's grant of summary judgment in favor of prison officials on a failure to protect claim against plaintiff's prison counselor who called him "a pedophile, gay, and a snitch" in front of other inmates); *see also Renchenski v. Williams*, 622 F.3d 315, 326 (3d Cir. 2010) ("It is largely without question . . . that the sex offender label severely stigmatizes an individual, and that a prisoner labeled as a sex offender faces unique challenges in the prison environment."); *Dongarra v. Smith*, 27 F.4th 174, 179 (3d Cir. 2022) ("If other prisoners thought he was a sex offender, they might have assaulted or even killed him. That is as serious as it gets."). In *Moore*, the Third Circuit rejected the defendants' argument that the plaintiff's claim failed because he had "not shown that he was assaulted or suffered any harm," with the court reasoning that "an inmate need not wait until an actual attack occurs to obtain relief." *Moore*, 823 F. App'x at 96. Jones alleges that by disclosing his criminal charges of rape to other inmates, Morrison placed him at increased risk of harm and indeed

suggested that Jones "better check in or he's gonna die." (Compl. at 12 ¶ 12.) Jones thus states a plausible failure to protect claim against Officer Morrison that passes statutory screening.

3

Jones also asserts a failure to protect claim against Officer Lee based on the December 11, 2024 incident in which he was assaulted by several inmates following a skirmish over a tablet. (Compl. at 14-15, 33.) Jones alleges that Lee failed to take any action after he got into a physical fight with an inmate who grabbed the tablet from him, or after a number of inmates stabbed and shoved him while pretending to break up the fight. (*Id*. at 15 ¶¶ 9-14.) Lee neither intervened to stop the assaults nor called for help, despite witnessing the entire incident and being the only assigned officer on the tier. (*Id*. at 14-15.) As a result of Lee's inaction, Jones alleges he suffered stab wounds to his body and head and a back injury that kept him from standing up straight for a week. (*Id*. at 16 ¶¶ 20, 26.) Because Jones asserts facts indicating that Lee was aware of serious threats to his safety, yet failed to take any action to stop them, he alleges a plausible failure to protect claim against Lee that will pass statutory screening.

J

Jones alleges a Fourteenth Amendment failure to intervene claim against Officer Mink based on Mink's "failure to intervene & stop and/or report [the] physical and sexual assault" against Jones on April 20, 2025. "[A] corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and

simply refused to do so." *Smith*, 293 F.3d at 650; *see also Arrington v. Gustafson*, No. 22-226, 2026 WL 523114, at *12 (W.D. Pa. Feb. 25, 2026) ("Whether raised by a pretrial detainee under the Fourteenth Amendment or a convicted prisoner under the Eighth Amendment, a corrections officer's failure to intervene in a beating can be the basis of liability . . . under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so[.]" (quoting *Gorrio v. Briggs*)). "For a corrections officer to have a realistic and reasonable opportunity to intervene where an inmate is attacked, the beating must occur within the officer's presence or be within his knowledge, and the officer must have had sufficient time to intervene." *Burke v. Powell*, No. 20-1013, 2023 WL 3561345, at *9 (D.N.J. May 18, 2023) (citing *Smith*, 293 F.3d at 651).

Jones alleges that Officer Mink served as the lookout on the medical unit while several other officers beat and sexually assaulted him. (Compl. at 26 ¶ 29 to 27 ¶ 39.) Based on the allegations, Mink was aware that the officers were assaulting Jones and had a "reasonable opportunity to intervene," in light of his proximity to the attack and its duration, but he chose not to. Accordingly, Jones asserts a plausible Fourteenth Amendment failure to intervene claim against CO Mink that will survive statutory screening.

K

Jones alleges several claims against supervisory prison officials based on their purported liability for the actions of their subordinates. There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014),

*reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 227 (3d Cir. 2015).

The first type of liability includes a failure to supervise, however, a plaintiff asserting such a claim must "identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure." *Barkes*, 766 F.3d at 317; *see also Chavarriaga*, 806 F.3d at 227. A supervisory claim requires "a showing that there was an actual constitutional violation at the hands of subordinates" before finding liability on the part of the supervisor prison official. *Allen v. Eckard*, 804 F. App'x 123, 127 (3d Cir. 2020) (*per curiam*) (concluding that failure to train and supervise claims asserted against supervisor defendants were meritless where the plaintiff failed to make a plausible showing of an underlying constitutional violation). "Put another way, the inmate must identify the supervisor's specific acts or omissions

demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury." *Chavarriaga*, 806 F.3d at 227.

Jones asserts Fourteenth Amendment claims against Lt. McMichaels, Lt. Singh, Lt. Sampson, Sgt Davis, Sgt. Bynum, Deputy Warden Booker, Warden Patterson based on their "failure to take reasonable steps to prevent, or correct unconstitutional conditions, and/or misconduct, [and because they] failed to intervene [and] permitted [unconstitutional] conduct to continue" even after Jones reported the problems. (Compl. at 33.) As an initial matter, these vague claims appear to be partly duplicative of Jones's failure to investigate, failure to intervene, conditions of confinement, and grievance-related claims against the same Defendants, which the Court addressed above.

To the extent Jones is asserting claims based on these Defendants' failure to train or supervise their subordinates, those claims are undeveloped. "Under Section 1983, a supervisor may be liable for [his or her] failure to train or supervise employees . . . ." *Whitfield v. City of Philadelphia*, 587 F. Supp. 2d 657, 666 (E.D. Pa. 2008). A claim for supervisory liability or liability based upon a failure to train involves four elements: (1) that an existing policy created an unreasonable risk of constitutional injury; (2) the supervisor was aware of this unreasonable risk; (3) the supervisor was indifferent to the risk; and (4) the injury resulted from the policy or practice. *See Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989). Where a need for "more or different training . . . is so obvious, and the inadequacy so likely to result in constitutional violations, that the failure to train . . . can fairly be said to represent

official policy," *City of Canton v. Ohio*, 489 U.S. 378, 390 (1989), and that failure to train "actually causes injury," a supervisor may be held liable. In addition,

> In resolving the issue of [supervisory] liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [supervisor], for the officer's shortcomings may have resulted from factors other than a faulty training program. . . . Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training. . . . Moreover, for liability to attach . . . the identified deficiency in [the] training program must be closely related to the ultimate injury.

*Id*. at 390-91.

Read liberally, Jones alleges that these seven Defendants are liable because they failed to prevent constitutional violations committed by their subordinates or to discipline them after the fact. However, his allegations do not explain the factual basis for his claims against each Defendant and instead lump them all into a single claim. Where there are multiple events and defendants at issue, alleging personal involvement cannot be accomplished by referring to the Defendants as a group without clarifying the specific basis for each Defendant's liability. *See Lawal v. McDonald*, 546 F. App' x 107, 113 (3d Cir. 2014). Moreover, Jones does not provide any allegations suggesting that any of the seven Defendants was aware of an "unreasonable risk" due to a deficiency in the training of a subordinate or a pattern of misconduct, and that Jones was injured by the failure to address that unreasonable risk; accordingly, his supervisory liability claim does not meet the pleading standard. *See Ludwig v. Terra*, No. 25-1213, 2025 WL 2325654, at *14 (E.D. Pa. Aug. 12, 2025) (dismissing supervisory liability claims where plaintiff "asserts in conclusory fashion that the Supervisory

Defendants failed "to intervene, supervise, properly train or adequately discipline the subordinate defendants.' He does not allege facts to support his claim and the claim, therefore, is not plausible." (citation omitted)). Jones's supervisory liability claims will therefore be dismissed without prejudice.

L

Jones asserts claims against Defendants John Doe, Jane Doe 2 and Jane Doe 3 based on their failure to provide him adequate medical care. To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer*, 511 U.S. at 835. Because Jones was a pretrial detainee at the time of the events in question, the Fourteenth Amendment governs his claims. *See Hubbard*, 399 F.3d at 166. However, the standard for claims related to a prisoner's medical needs is essentially the same under either the Eighth Amendment or Fourteenth Amendment for purposes of the analysis. *See Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019) (citing *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581-82 (3d Cir. 2003); *Parkell v. Morgan*, 682 F. App'x 155, 159-60 (3d Cir. 2017) (*per curiam*).

A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. "A serious medical need is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a layperson would easily recognize the necessity for a

doctor's attention." *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir. 2023) (cleaned up). "A serious medical need exists where 'failure to treat can be expected to lead to substantial and unnecessary suffering.'" *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir. 1991)). Deliberate indifference is properly alleged "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, [or] (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Montanez v. Price*, 154 F.4th 127, 141 (3d Cir. 2025), *cert. denied*, 2026 WL 1718015 (U.S. June 15, 2026) (citation omitted). This standard is met when a delay or denial of medical care is intended to inflict pain without medical justification or is based solely on a nonmedical reason without any effort to mitigate harm. *DiFraia v. Ransom*, 171 F.4th 622, 630 (3d Cir. 2026). "[P]rison officials may not 'deny reasonable requests for medical treatment . . . when such denial exposes the inmate to undue suffering or the threat of tangible residual injury.'" *Durham v. Kelley*, 82 F.4th 217, 230 (3d Cir. 2023) (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017)). [P]rison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition." *Palakovic*, 854 F.3d at 228 (quotations and citations omitted).

1

Jones alleges that after the April 20, 2025 use of force incident, he was briefly seen by Defendants Jane Doe 2, and Jane Doe 3, who are nurses for YesCare. (Compl.

at 28 ¶ 42). Jones told the two nurses what happened, including his jaw and hand injury and the sexual assault, but they ignored him and did not examine his injuries. (*Id.*) Jones alleges that his jaw injury was sufficiently serious that he could not eat solid food for two weeks, (*id.* at 29 ¶ 55.) and that due to his hand injury he was unable to make a fist or lift heavy objects with his left hand for several months, and that the hand remains injured, (*id.* at 28 ¶ 51). Jones also alleges that due to the blows to his body, his ribs "were discolored and tender, and it hurt for [him] to breathe for over a week." (*Id.* ¶ 56.) Thus, he plausibly alleges that he was experiencing a serious medical need where failure to treat him would "expos[e] [him] to undue suffering or the threat of tangible residual injury."' *Durham*, 82 F.4th at 230. Nevertheless, he asserts that Jane Doe 2 and 3 did not examine or treat him. He thus plausibly alleges a claim of deliberate indifference to his serious medical needs that will pass statutory screening.[13]

2

Jones asserts that John Doe examined him after the December 11, 2024 altercation in which he was stabbed and shoved by several other inmates. (Compl. at 15-16.) Jones states that the nurses examined and counted seven stab wounds. (*Id.* at 16 ¶ 20.) He notes that "photos of [his] injuries were taken" and that he was "cleaned and bandaged." (*Id.* 21.) When examined by John Doe, Jones:

> informed Defendant John Doe of his back injury, and that his right bicep was inflamed from the penetration of

[13] Jones also appears to allege a claim based on the failure of Jane 2 and 3 to report the alleged "physical & sexual assault" on April 20, 2025. (Compl. at 34.) To the extent Jones alleges a Fourteenth Amendment failure to protect claim, there is no assertion that he was harmed by the nurses' failure to report the incident, and the Court is aware of no constitutional requirement that prison medical staff report misconduct allegations made to them by inmates unless they present a risk of future harm.

> unidentified object he was stabbed with, as well as his concerns of how deep the stab wound to his head was due to all the bleeding, and asked to be tested for any transmitted decease, and a tetanus shot.

(*Id.* ¶ 22.) Jones also requested to be sent to an outside hospital for examination. (*Id.* ¶ 23.) John Doe denied the request and told Lt. Singh that Jones didn't need any further medical care, and was cleared to return to his cell. (*Id.* ¶¶ 24-25.) Jones's claim against John Doe is undeveloped. He acknowledges that he received some medical care, including having his injuries examined, and his wounds cleaned and bandaged, and that John Doe concluded the injuries were not sufficiently serious to warrant further treatment or admission to an outside hospital. "Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)). "Nonetheless, there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier and less efficacious treatment' of the inmate's condition." *Id.* at 228 (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)). Jones has not alleged facts indicating that John Doe's medical decisions were driven by improper, non-medical considerations, or that he was denied medical care altogether. Thus, the mere fact that Doe did not provide the level of treatment or testing that Jones requested does not by itself state a constitutional claim. *See, e.g., Smith v. Bolava*, 632 F. App'x 683, 686 (3d Cir. 2015) (affirming dismissal of a deliberate medical indifference claim where "[the plaintiff's] allegations admit that he was receiving some care for each

condition or symptom that he mentions, rather than having had to endure a 'complete denial' of medical care in any instance."). Accordingly, the Court will dismiss the denial of medical care claim against John Doe, with leave to amend.[14]

M

Jones asserts that his constitutional rights were violated when prison officials confiscated or moved his property without promptly inventorying or returning it to him. However, negligent and unauthorized intentional deprivations of property "[do] not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *see also Daniels v. Williams*, 474 U.S. 327, 328 (1986) (negligent acts of officials causing unintentional loss of property do not violate due process). A correctional facility's grievance procedure provides an adequate postdeprivation remedy for intentional deprivations of property by correctional employees. *Tillman v. Lebanon Cnty. Corr. Facility,* 221 F.3d 410, 422 (3d Cir. 2000) (holding that prison grievance system provides adequate post-deprivation remedy). Accordingly, Jones's due process claim is not plausible because he had an adequate remedy for the deprivation of his property through the prison grievance system, even if the outcome was unsuccessful. *See, e.g.*, *Mbewe v. Delbalso*, No. 23-2054, 2024 WL 510500, at *3 (3d Cir. Feb. 9, 2024) (*per curiam*) (affirming dismissal of due process claim because "[t]he prison grievance procedure provides an adequate post-deprivation remedy, and the existence of this post-deprivation remedy forecloses

[14] While Jones asserts that he made multiple requests for medical care after his symptoms continued and worsened in the subsequent days, (*id.* ¶¶ 26-27), there is no allegation that John Doe was involved in denying or ignoring those requests.

[plaintiff's] due process deprivation of property claim" (citation omitted)); *Ransome v. Longstreth*, No. 23-1726, 2023 WL 6122139, at *2 (3d Cir. Sept. 19, 2023) (*per curiam*) (existence of prison grievance process precluded due process claim, even where prisoner alleged violations of the grievance policy); *see also Hernandez v. Corr. Emergency Response Team*, 771 F. App'x 143, 145 (3d Cir. 2019) (*per curiam*) ("Even if the prison grievance procedures could be considered constitutionally inadequate, Pennsylvania's state tort law would provide an adequate remedy.") (citing 42 Pa. Cons. Stat. Ann. § 8522(b)(3)).

N

Jones asserts a First Amendment retaliation claim against Sgt. Davis based on her "throwing away Plaintiff's legal files, & legal books due to plaintiff's incident with defendant cook[.]" (Compl. at 38.) In order to state a plausible First Amendment retaliation claim, "a prisoner must allege that: (1) he was engaged in constitutionally protected conduct, (2) he suffered some adverse action at the hands of prison officials, and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take that action." *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (internal quotation marks omitted) (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)); *see also Coit v. Garman*, 812 F. App'x 83, 86 (3d Cir. 2020) (*per curiam*) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). Jones's retaliation claim is undeveloped and therefore not plausible. As an initial matter, he does not allege what First Amendment conduct prompted Davis's actions. Indeed, it is not clear when he alleges Davis threw away his legal files and legal books. He alleges that after his April 20, 2025 altercation with Cook escalated into a use of force incident involving several

other officers, he asked Davis about when his property would be transferred to the Restricted Housing Unit. She allegedly told him, "don't worry about it, it's going in the trash." (Compl. at 28 ¶ 45.) To the extent he asserts a retaliation claim based on these allegations, they are not plausible because the First Amendment only prohibits adverse actions taken in response to protected conduct, and getting into a fight with a correctional officer is not protected activity. *See McKeithen v. Cooper*, No. 25-157, 2026 WL 286235, at *5 (M.D. Pa. Feb. 3, 2026) ("It is implausible that McKeithen's physical altercation with a correctional officer, which he asserts triggered the retaliation, was a constitutionally protected activity."). Accordingly, Jones's First Amendment retaliation claim will be dismissed without prejudice.

IV

For the foregoing reasons, the Court will grant Jones leave to proceed *in forma pauperis* and dismiss his Complaint in part with prejudice and in part without prejudice, while allowing other claims to proceed. The following claims will be dismissed with prejudice: all claims based on the Defendants' failure to investigate the allegations in Jones' complaints and grievances, all claims based on the Defendants' involvement in the grievance process, and all claims based on the deprivation of Jones's property. The following claims will pass statutory screening and may proceed to service:

- The Fourteenth Amendment procedural due process claims against Jane Doe based on the September 19, 2024 disciplinary hearing;

- The Fourteenth Amendment failure to protect claims against Officer Cook, Officer Lee, and Officer Morrison, based on the September 12, 2024, November 10, 2024, and December 11, 2024 incidents, respectively;
- The Fourteenth Amendment failure to intervene claim against Officer Mink based on the April 20, 2025 incident;
- The Fourteenth Amendment excessive use of force claims against Sgt. Davis, Officer Cook, Officer Hall, Officer Robinson, and Sgt. Bynum based on the April 20, 2025 incident;
- The Fourteenth Amendment sexual assault claims against Sgt. Bynum, Officer Williams, and Officer Pugh based on the April 20, 2025 incident;
- The Fourteenth Amendment conditions of confinement claims against Officer Sampson, Deputy Warden Booker and Warden Patterson, based on Jones' conditions of confinement from December 2024 to January 2025; and
- The Fourteenth Amendment denial of adequate medical care claims against Jane Doe 2 and Jane Doe 3, based on the April 20, 2025 incident.

The balance of the Complaint will be dismissed without prejudice. The Court will permit Jones to file an amended complaint if he can cure the defects the Court has noted as to his claims dismissed without prejudice. In the alternative, Jones may proceed with the claims that pass statutory screening. An appropriate Order follows.

**BY THE COURT:**

**/s/ Gerald J. Papppert**

**Gerald J. Pappert, J.**